1

**KALIELGOLD PLLC**
Jeffrey D. Kaliel (SBN 238293)
1100 15th Street NW, 4th Floor
Washington, D.C.  20005
Telephone: (202) 280-4783
jkaliel@kalielpllc.com

**KALIELGOLD PLLC**
Sophia G. Gold (SBN 307971)
950 Gilman Street, Suite 200
Berkeley, CA 94710
Telephone: (202) 350-4783
sgold@kalielgold.com

**EDELSBERG LAW, P.A.**
Scott Edelsberg (CA Bar No. 330090)
scott@edelsberglaw.com
1925 Century Park East, Suite 1700
Los Angeles, CA 90067
Tel: 305-975-3320
Fax: 786-623-0915

*Attorneys for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARLENE SANCHEZ, individually, and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> NAVY FEDERAL CREDIT UNION, <br><br> Defendant. | Case No. 2:22-cv-01891-KJM-AC <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **[DEMAND FOR JURY TRIAL]** |

1

Plaintiff SHARLENE SANCHEZ ("Plaintiff") brings this complaint, by and through her attorneys and on behalf of all others similarly situated, against Navy Federal Navy Federal Credit Union ("Navy Federal," "NFCU," or "Navy Federal") and alleges upon information and belief as follows:

### INTRODUCTION

1.     The Zelle money transfer system is rife with fraud—fraud that places all Zelle users at an acute and immediate risk. Billions of dollars of fraudulent transactions are processed by the service each year. Victims of Zelle fraud, like Plaintiff, are often left devastated by such fraud, which can drain hundreds or thousands of dollars from their bank accounts.

2.     But when Zelle fraud victims turn to Navy Federal for help, the Bank has a simple, repeated, bad faith response:  it is your fault, you are on your own, and we will not help.

3.     The Bank's corporate policy of "blaming the victim" is good business for the Bank. The Bank has a huge incentive to get as many of its customers as possible to sign up for and use the Zelle service for payments and money transfers. The more of its accountholders it can convince to sign up for and use Zelle, the more the Bank saves by avoiding transaction payments to *other* payment networks.  Accordingly, the Bank works with Zelle to aggressively market the Zelle service to its accountholders, repeatedly urging accountholders to sign up for Zelle every time they log in to online banking or use the mobile app.

4.     But the marketing of the Zelle service by Navy Federal, including during the quick, rushed process by which Navy Federal accountholders sign up for Zelle in the Bank's mobile banking app or website, contains materially deceptive representations that the service is "safe" and material omissions regarding the acute and immediate risk of fraud. Those representations and omissions, which Plaintiff relied upon, are false and misleading.

5.     Unlike other commonly used consumer payment systems—credit cards, debit cards, even Paypal—***Zelle has no consumer fraud protections, money transfers are immediate and irrevocable, and the Bank will provide no help in the case of fraud***.  These essential, material facts about Zelle are omitted from marketing about Zelle promulgated by Navy Federal, for a simple

FIRST AMENDED CLASS ACTION COMPLAINT

1  reason: no reasonable consumer would sign up for and use the service if these facts were fairly
2  disclosed.

3       6.    Having lured Navy Federal accountholders to sign up for and use the Zelle service
4  with deceptive and incomplete marketing promises, the Bank fails victims of Zelle fraud in two
5  distinct ways.

6       7.    <u>First</u>, the Bank maintains a massive bureaucratic apparatus designed to make it
7  impossible for victims to lodge a successful fraud claim. When such victims make a claim for fraud,
8  and as occurred to Plaintiff, NFCU denies the claim without conducting a full investigation and
9  blames fraud victims for the fraud. As occurred with Plaintiff, NFCU summarily rejects fraud claims
10  without explanation or recourse.

11       8.    <u>Second,</u> for victims of Zelle fraud who were tricked into making fraudulent transfers
12  to fraudsters, the Bank has adopted a practice wherein any and all such fraud reimbursement claims
13  are denied in their entirety—another instance of the Bank's "blame the victim" corporate policy.

14       9.    Common to both circumstances is that the consumer, not Navy Federal or Zelle, is left
15  without recourse following the fraud or unauthorized transaction by a third-party.

16       10.    These policies and practices contradict Navy Federal's marketing promises.

17       11.    These policies and practices also violate the Electronic Fund Transfer Act ("EFTA")
18  a statute with the purpose of "provid[ing] a basic framework establishing the rights, liabilities, and
19  responsibilities of participants in electronic fund and remittance transfer systems." *Id*. § 1693(b). "The
20  primary objective of [the EFTA] is the provision of individual consumer rights." *Id*.

21       12.    These policies and practices also breach contractual promises the Bank made and
22  violate the duty of care owed, as discussed in detail below.

23       13.    Plaintiff and the Class members have been injured by signing up for and using Zelle.
24  Plaintiff brings this action on behalf of themselves, and the putative Classes, because Plaintiffs should
25  not be left "holding the bag" for fraudulent transactions.

26       14.    Plaintiff seeks actual damages, punitive damages, restitution, and an injunction on
27  behalf of the general public to prevent NFCU from continuing to engage in its illegal practices as
28  described herein.

FIRST AMENDED CLASS ACTION COMPLAINT

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the class is a citizen of a different State than Navy Federal. The number of members of the proposed Classes in aggregate exceeds 100 users. 28 U.S.C. § 1332(d)(5)(B).

16.    This Court has personal jurisdiction over the Navy Federal because it regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Navy Federal is deemed to reside in any judicial district in which they are subject to personal jurisdiction and substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

18.    Plaintiff Sharlene Sanchez is, and at all times mentioned herein a natural person, individual citizen and resident of Murrieta, California.

19.    Navy Federal Navy Federal Credit Union is and was, at all relevant times to this lawsuit, a nationally-chartered credit union with its principal place of business in Vienna, Virginia. NFCU operates banking centers and conducts business throughout the State of California.

### ZELLE – THE FAVORITE APP OF FRAUDSTERS AND A MONEYMAKER FOR THE BANK

20.    Created in 2017 by America's largest banks[1] to enable digital money transfers, Zelle comes embedded in banking apps and is now America's most widely used money transfer service, outpacing its closest rival (Venmo) by $260 billion in transfers in 2021.[2]

---

[1] Bank of America, Capital One, JPMorgan Chase, PNC, BB&T (now Truist), U.S. Bank and Wells Fargo.

[2] *Fraud is Flourishing on Zelle. The Banks Say It's Not Their Problem*, The New York Times (March 6, 2022) https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html (last visited September 6, 2022).

FIRST AMENDED CLASS ACTION COMPLAINT

21.     About 1.8 billion payments — totaling $490 billion — were sent by consumers and businesses through the Zelle Network in 2021, according to the Early Warning Services. Total dollars transferred were up 59% from 2020.

22.     Nearly 18 million people have been hit by "widespread fraud" on money transfer apps, according to a letter sent in late April to Zelle's network operator Early Warning Services by U.S. Sens. Elizabeth Warren of Massachusetts, Robert Menendez of New Jersey, and Jack Reed of Rhode Island.[3]

23.     Zelle's biggest draw — the immediacy of its transfers — also makes scams more effective and 'a favorite of fraudsters,' as consumers have no option to cancel a transaction even moments after authorizing it," the letter stated.

24.     Organized crime is rampant on Zelle.

25.     The 1,500 banks and credit unions who are members of the Zelle network, including NFCU, know full well that they have a widespread fraud problem on their hands, but have misrepresented and failed to take steps to warn their accountholders of these risks—or protect their accountholders who fall prey to fraud.

26.     In short, and unbeknownst to average Zelle users, the Zelle network has become a preferred tool for fraudsters like romance scammers, cryptocurrency con artists and those who use social media sites to advertise fake concert tickets and purebred puppies—or simply for those who steal phones and computers and use their access to drain money from accounts via Zelle.

27.     As one U.S. Senator said to CEOs of some of the banks that own Zelle: "Zelle is not safe. You built the system, you profit from every transaction on the system and you tell people that it is safe. But when someone is defrauded, you claim that's the customer's problem," said Senator Elizabeth Warren, during a Senate Banking Committee hearing in September 2023.

28.     Worse, even consumers who disputed "unauthorized" Zelle transfers and who were not duped by fraudsters to initiate the Zelle transfer, such as Plaintiff, are not being reimbursed and

---

[3] Letter from Elizabeth Warren, Robert Menendez, Jack Reed, Sen., U.S. Cong., to Al Ko, CEO, Early Warning Services (April 2, 2022).

FIRST AMENDED CLASS ACTION COMPLAINT

protected by their banks, according to an October 2022 Senate report about fraud on Zelle. Data from Bank of America, U.S. Bank, PNC Bank and Truist revealed that they reimbursed consumers for only 47% of the dollar amount of cases in which customers reported unauthorized payments on Zelle in 2021 and the first half of 2022.[4]

29.    Fraudsters and scammers have turned to Zelle as their favorite service. The service seems designed precisely to meet their fraudulent needs, since transfers are immediate and unrecoverable. There is an additional design feature of Zelle that makes it a fraudster's favorite: one can become a Zelle user and recipient without revealing their true identity.

30.    Led by Idaho Attorney General Lawrence Wasden and Oregon Attorney General Ellen Rosenblum, a bipartisan coalition of thirty-three (33) attorneys general wrote the Consumer Financial Consumer Protection Bureau ("CFPB"), calling for stronger consumer safeguards for money sharing platforms and apps like Zelle. The letter, written in response to the CFPB's request for comments on its inquiry into "Big Tech Payment Platforms," noted a rise in complaints against popular payment apps including Zelle. The letter highlighted that: "[m]any consumers have been scammed out of hundreds or thousands of dollars by other users of these payment platforms [like Zelle]. ***Scammers are attracted to real-time payment platforms, in large part, because they do not need to reveal their true identity to set up an account"*** (emphasis added).

31.    As a result, crooks are using Zelle and other apps to rob consumers when listing fake puppies to sell, advertising phony apartments or homes to rent, threatening utility service cut-off without immediate transfer of money, or offering extra income from wrapping a personal car in an ad.

32.    A common version of the utility scam involves fraudsters, posing as utility company employees, initially contacting customers via text message, then by phone call and asking them to make missed payments via a website.

---

[4] "Facilitating Fraud: How Consumers Defrauded on Zelle are Left High and Dry by the Banks that Created It," Office of Sen. Elizabeth Warren

FIRST AMENDED CLASS ACTION COMPLAINT

33.     Another common scam: a prospective buyer supposedly wants to buy an item listed on Facebook Marketplace but then claims that the seller needs to upgrade his Zelle app to accept money from their "business account" for the big-ticket purchase to go through, according to a June, 2022 alert by the Better Business Bureau. The scammer supposedly puts up $300 and sends you screenshots of his Zelle app as proof. Then, the scammer pressures you into paying him back.

34.     "Scammers go where it's easy to get the money. Zelle is their current mechanism to drain consumer accounts," warned Ed Mierzwinski, PIRG Education Fund's senior director of federal consumer programs. "The scammers are taking advantage of consumers because the banks are letting them,"Mierzwinski said. "My basic advice is don't use these apps."[5]

35.     The fraud risk is so acute and immediate that if consumers do use Zelle, PIRG suggests consumers keep one separate bank account to link to Zelle accounts.

36.     Scams like these are rampant on the Zelle network precisely because of the design and architecture of the network, specifically that money transfer is instantaneous and unrecoverable. Indeed, there is virtually no recourse for consumers to recoup losses due to fraud, unlike other payment methods commonly used by American consumers—debit cards, credit cards, and even Paypal or Venmo.

37.     The unique, misrepresented, and undisclosed architecture of the Zelle payment system and NFCU's own fraud policies means—again, unlike other payment options commonly used by American consumers—that virtually any money transferred for any reason via Zelle is gone forever, without recourse, reimbursement or protection for victimized accountholders.

38.     Craigslist, PayPal, and Venmo faced early criticism for leaving users vulnerable to fraud. In response, each made changes. Craigslist, for example, added a warning about scams on every

---

[5] *DTE impersonators drained Rochester Hills woman's checking account using Zelle app*, Detroit Free Press (June 30, 2022), https://www.freep.com/story/money/personal-finance/susan-tompor/2022/06/30/utility-shutoff-scam-stole-cash-via-zelle/7714138001/ (last accessed September 7, 2022).

FIRST AMENDED CLASS ACTION COMPLAINT

1   sale listing. PayPal increased the protections it offers on some digital sales and provided a detailed

2   disclosure about what transactions it will and won't protect.

3       39.    And Venmo—which, like Zelle, does not protect users if a seller does not deliver what

4   they promised—upgraded its security policies in 2015 to better detect fraud, including by notifying

5   customers when someone adds an email address or new device to their account. The Federal Trade

6   Commission later criticized the company for not having those protections in place from the start.

7       40.    Navy Federal, however, did nothing to stop the problem or sufficiently warn users of

8   the problem prior to the lawsuit filed by Plaintiff, for fear of suppressing new users and use of the

9   service by existing users, and because of its financial interests.

10       41.    Navy Federal claims to have a "zero liability policy" for cases in which a bad actor

11   gains access to a consumer's account and uses it to make unauthorized Zelle transfers, but it fails to

12   keep this promise.

13       42.    On information and belief, NFCU uses Zelle to insulate itself from financial liability

14   for fraudulent and unauthorized transactions.

15                   **NFCU'S FALSE AND MISLEADING ZELLE MARKETING AND DECEPTIVE**

16              **SIGN-UP PROCESS LURES ACCOUNTHOLDERS TO SIGN UP FOR AND USE ZELLE**

17       43.    Zelle was introduced to the American public with a massive advertising blitz starting

18   in 2018. Navy Federal and partner banks marketed Zelle as a safer alternative to other instant payment

19   apps "because it's backed by the banks."

20       44.    Navy Federal's aggressive marketing touted Zelle's safety and security. In one TV

21   commercial, performer Daveed Diggs from the Broadway show Hamilton rapped, "You can send

22   money safely cause that's what it's for / It's backed by the banks so you know it's secure."

23       45.    Plaintiff recalls viewing this advertisement.

24       46.    It is free to sign up with Zelle, and Zelle is integrated into NFCU's websites and mobile

25   app.

26       47.    Accountholders sign up for Zelle after they have already become Navy Federal

27   accountholders—often, years later.

28

FIRST AMENDED CLASS ACTION COMPLAINT

1     48.     During the Zelle sign-up process, users are not affirmatively provided with agreements

2 or disclosures previously provided at the time they opened their Navy Federal account.

3     49.     Navy Federal's mobile app and online banking website feature numerous invitations

4 and advertisements to sign up for and use the Zelle service.

5     50.     In its marketing about Zelle and during the Zelle signup process within the Bank's

6 mobile app or website, the Bank makes repeated promises that Zelle is a "fast, **safe** and easy way to

7 send and receive money" (emphasis added).

8     51.     It also promises: "Move money in the moment.  It's simple and **secure** – with lots of

9 people you know" (emphasis added).

10     52.     At no time in its marketing or during the sign-up process does NFCU warn potential

11 users of the true security risks of using the Zelle service—including the immediate and acute risk of

12 fraud, the dangerous architecture of the system (described above) and the risk that fraudulent losses

13 will never be reimbursed by NFCU.

14     53.     NFCU misrepresents (and omits facts about) the true nature, benefits, and risks of the

15 Zelle service, functioning of which means that users are at extreme and undisclosed risk of fraud

16 when using Zelle. Had Plaintiff been adequately informed of these risks, she would not have signed

17 up for or used Zelle.

18     54.     Navy Federal's marketing representations about Zelle—including within its app and

19 website—misrepresent and never disclose these risks and material facts, instead luring accountholders

20 to sign up for and use the service with promises of ease, safety and security.

21     55.     These representations—which all users view during the sign-up process—are false and

22 contain material omissions.

23     56.     Navy Federal misrepresents the true nature, benefits and risks of the service, which

24 burden users with an extreme and undisclosed risk of Zelle causing losses due to fraud. Plaintiff would

25 not have used Zelle if she had been adequately informed of the risks.

26     57.     Navy Federal's misrepresentations and omissions are especially pernicious because

27 Navy Federal alone know material facts regarding Zelle—including rampant fraud and the fact that

28 fraud-induced Zelle transfers will almost never be reimbursed to accountholders.

FIRST AMENDED CLASS ACTION COMPLAINT

**FALSE AND MISLEADING ZELLE MARKETING**

58.    Zelle fraud is not a bug, it's a feature of the system. It's everywhere. And Navy Federal has done nothing to stop it, for fear of suppressing new users.

59.    In its marketing about Zelle and during the Zelle signup process within the Bank's mobile app or website, the Bank makes repeated promises that the Zelle money transfer services is "a fast, **safe** and easy way to send and receive money" (emphasis added).

60.    It also promises: "Move money in the moment. It's simple and **secure** – with lots of people you know" (emphasis added).

61.    Navy Federal prominently touts Zelle to its accountholders as a secure, free and convenient way to make money transfers. However, the marketing (including during the sign-up process) misrepresents and omits a key fact about the service that is unknown to accountholders:  that there is virtually no recourse for consumers to recoup losses due to fraud.  Indeed, <u>unlike</u> virtually every other payment method commonly used by American consumers—debit cards, credit cards, and even Paypal—there is a no protection for accountholders who are victims of fraud, and virtually no recourse for accountholders attempting to recoup losses due to fraud.

62.    The unique, misrepresented, and undisclosed architecture of the Zelle payment system means—again, unlike other payment options commonly used by American consumers—that virtually any money transferred for any reason via Zelle is gone forever, without recourse, reimbursement or protection. This too is omitted from all marketing, including during the sign-up process.

63.    Worse, NFCU misrepresents and omits the truth about a secret policy it has adopted: it does not and will not reimburse its accountholders for losses when users are tricked into making Zelle transfers due to fraud, and will almost never reimburse accountholders for losses when their phones or other access devices are stolen—even where those losses are timely reported by accountholders.

64.    Navy Federal was required not to misrepresent the unique and dangerous features of the Zelle service in its marketing about it and in contractual representations.  But it failed to do so.

65.    As a result, users like Plaintiff sign up for and used the Zelle service without the benefit of accurate information regarding that service, and later end up with huge, unreimbursed losses due

1  to fraud.  Such users never would have signed up for Zelle in the first place if they had known the

2  extreme risks of signing up for and using the service.

3        66.    The acute and immediate risks described above are well known to Navy Federal but

4  are omitted from all of its marketing regarding Zelle.

5  **NAVY FEDERAL HAS IGNORED REGULATORY GUIDANCE**

6        67.    Recent CFPB guidance on unauthorized Electronic Fund Transfers ("EFTs") indicates

7  P2P payments are EFTs, such as transactions made with Zelle, and trigger "error resolution

8  obligations" to consumers to protect them from situations where they are fraudulently induced and

9  requested by a third party to provide their account information that results in authorized debits from

10  their accounts.[6]

11        68.    An unauthorized EFT is an EFT from a consumer's account initiated by a person other

12  than the consumer without actual authority to initiate the transfer and from which the consumer

13  receives no benefit. 12 CFR 1005.2(m). Unauthorized EFTs include transfers initiated by a person

14  who obtained a consumer's access device or account access information through fraud or robbery and

15  consumer transfers at an ATM that were induced by force. Comments 2(m)-3 and 4.

16        69.    Other examples of situations involving unauthorized EFTs includes, according to the

17  CFPB, when a thief steals a consumer's debit card and initiates a payment using the consumer's stolen

18  debit card; when a fraudster uses a bank-provided P2P payment application to initiate a credit push

19  payment of out of the consumer's deposit account; and/or when a fraudster hacks into a consumer's

20  phone and uses the mobile wallet to initiate a debit card transfer out of the consumer's account.[7]

21        70.    Additionally, the Federal Deposit Insurance Corporation ("FDIC") issued a report in

22  March 2022 finding that Regulation E's "liability protections for unauthorized transfers apply even

23  

---

24  [6]"Electronic Fund Transfers FAQs," Consumer Financial Protection Bureau,

25  https://www.consumerfinance.gov/compliance/compliance-resources/deposit-accounts-
resources/electronic-fund-transfers/electronic-fund-transfers-faqs/#financial-institutions-2  (last

26  visited June 28, 2022).

27  [7] *Id.*

28  

**FIRST AMENDED CLASS ACTION COMPLAINT**

1  if a consumer is deceived into giving someone their authorization credentials."[8] Further, the FDIC

2  stated that "[c]onsumer account disclosures cannot limit protections provided for in the regulation."[9]

3  The FDIC stated that both the banks and money payment platforms ("MPPs"), such as Zelle, are

4  considered "financial institutions" under Regulation E, and as such have investigative and error

5  resolution obligations under Regulation E.

6       71.     Even so, Navy Federal has not changed course and provided protections for fraud.

7       72.     On information and belief, Navy Federal does not reimburse consumers for losses

8  from unauthorized EFTs due to Zelle fraud, even where the losses are timely reported by consumers.

9  **NAVY FEDERAL BREACHES CONTRACT PROMISES AND THE IMPLIED COVENANT AND**

10 **MISREPRESENTS FRAUD PROTECTIONS REGARDING ZELLE IN ITS ACCOUNT CONTRACTS**

11      73.     NFCU's Deposit Agreement & Disclosures, attached as **Exhibit 1**, applicable to

12 consumer accounts repeatedly promises users that, if they timely report fraud, such fraud will be fairly

13 investigated and accountholders will not be liable for fraudulent transfers.

14      74.     Zelle is never mentioned by name, not even a single time, in the Deposit Agreement

15 that accountholders receive when opening a Navy Federal account.

16      75.     With respect to transactions governed by Regulation E, the Agreement provides:

17

18  **Your Liability for Unauthorized Electronic Funds Transfers**
    **Notify us AT ONCE if you believe:**

19      •  your account may have been accessed without your authority;
        •  your card, code, or password has been lost or stolen;

20      •  someone has transferred or may transfer money from your account without
           your permission; or

21      •  an electronic funds transfer has been made without your permission using
           information from your check or your MMSA check

22

23  The best way to minimize your possible loss is to telephone or, if you have Online
    Banking, contact us through our eMessaging system at **navyfederal.org**, although you

24

25  _____

26  [8] "Consumer Compliance Supervisory Highlights Federal Deposit Insurance Corporation," (March
    2022),              https://www.fdic.gov/regulations/examinations/consumer-compliance-supervisory-
    highlights/documents/ccs-highlights-march2022.pdf.

27

28  [9] *Id.*

may advise us in person or in writing. See the telephone numbers and address listed at the end of this agreement and disclosure. If you do not notify us, you could lose all the money in your account (*plus your maximum line of credit amount*).

If you tell us within two (2) business days after you discover your password or other means to access your account has been lost or stolen, your liability is no more than $50.00 should someone access your account without your permission. If you do not tell us within two (2) business days after you discover such loss or theft, and we can prove that we could have prevented the unauthorized use of your password or other means to access your account if you had told us, you could be liable for as much as $500.00.

**Also, if your statement shows transfers that you did not make or authorize, tell us AT ONCE**. If you do not tell us within sixty (60) days after the statement was delivered to you of any unauthorized or fraudulent use of your account, you may not get back any of the money you lost after the sixty (60) days if we can prove that we could have stopped someone from taking the money if you had told us in time. If a good reason (*such as a long trip or a hospital stay*) prevented you from telling us, we may in our sole discretion extend the time periods.

**In Case of Errors or Questions about your Electronic Transfers**
If you think your statement or receipt is wrong, or if you need more information about a transaction listed on your statement or receipt, contact us as soon as possible at the telephone numbers and address listed at the end of this agreement and disclosure.

We must hear from you no later than sixty (60) days after the FIRST statement on which the problem or error appeared… We will determine whether an error occurred within ten (10) business days (*twenty (20) business days for new accounts*) after you notify us of the error and will correct any error promptly… If it is determined that there was no error, we will… send you a written explanation within three (3) business days… You may ask for copies of documents used in our investigation.

*See Deposit Agreement*, at 11-12.

76.     These provisions are and were reasonably understood by Plaintiff to mean that Plaintiff would not be liable for electronic funds transfers effectuated by fraud.

77.     Indeed, Navy Federal's Zelle Terms and Condition (the "Zelle Terms"), attached as **Exhibit 2**, also indicates that accountholders will not be liable for fraudulent transactions, if reported timely.

78.     The Zelle Terms state:

**9. Liability for Unauthorized Transfers**

**NOTIFY NAVY FEDERAL AT ONCE if you believe:**
- **your account has been accessed without your authorization;**
- **your debit card, username, or password has been lost, stolen, compromised, or used or can be used without your authorization;**
- **someone has transferred or can transfer money from your account without your permission; or**
- **your statement shows transfers out of your account that you did not make or authorize.**

The best way to minimize your possible losses is to take steps to secure the compromise, for example, freeze your debit card and change your username and password, and contact Navy Federal as soon as possible using the contact information in Section 17.

If you do not notify us, you could lose all the money in your account (plus your maximum Checking Protection amount if you enrolled). If the unauthorized Zelle payment was made via ACH, see the Important Important Disclosures (NFCU 606) for more information on your potential liability. If the unauthorized Zelle payment was made via debit card, see the Debit Card Disclosure (NFCU 210AB), which includes Navy Federal's Zero Liability policy, for more information on your potential liability.

**10. Error Resolution**
If you think your account statement or transaction history has errors, or if you need more information about a transaction listed on your account statement or transaction history, contact Navy Federal as soon as possible using the contact information in Section 17. You MUST notify us of suspected errors no later than sixty (60) days after we FIRST make available your account statement on which the suspected error appeared. You will need to identify yourself and your account, describe the error or the transaction you are questioning, clearly explain why you believe an error exists or why you need more information, and tell us the dollar amount of the suspected error.

*See Zelle Terms*, at 13.

79.    The Zelle Terms also promise that Navy Federal will take active steps to detect and prevent fraud, which it failed to do: "the [Zelle] transfer may be blocked to prevent fraud or comply with regulatory requirements. If we delay or block a payment that you have initiated, we will notify you by email or text message and may request you or the recipient to take additional action." *Id.*, at 10.

80.    The Zelle Terms refers to and incorporates yet another agreement, the Debit Card Disclosure, attached as **Exhibit 3.**

81.    The Debit Card Disclosure contains a simple, straightforward "Zero Liability" promise: "Navy Federal's Zero Liability Policy for Fraud: [I]f you notify us of suspected fraud within

1  60 days of the statement date on which the fraudulent transactions first appear, ***we will not hold you***

2  ***responsible for confirmed fraudulent transactions.***" Debit Card Disclosure at para. 15 (emphasis

3  added).

4      82.    These provisions are and were reasonably understood by Plaintiff to mean that Plaintiff

5  would not be liable for Zelle transfers effectuated by fraud.

6      83.    As alleged with specificity herein, Navy Federal breached the Deposit Agreement, the

7  Zelle Terms, and the Debit Card Disclosure (collectively, the "Agreements"). Navy Federal adopted

8  an unreasonable and unfair understanding of the Agreements' term "unauthorized."

9      84.    That term reasonably encompasses all transactions occurring as a result of fraud. In

10  other words, no fraud-induced transaction can reasonable be considered "authorized."

11      85.    Navy Federal unfairly and improperly considers Zelle fraudulent Zelle transactions to

12  be "authorized," thus shirking fraud protection promises it otherwise makes in the Agreements.

13      86.    Moreover, Navy Federal has adopted an investigations apparatus that almost always

14  rejects valid claims, in breach of the implied covenant.

15                          **PLAINTIFF SANCHEZ'S FACTUAL ALLEGATIONS**

16      87.    When Plaintiff Sanchez signed up for Zelle she was not informed that Zelle's service

17  had a significant "catch" and that significant monetary losses could result from signing up for the

18  service—or that those losses almost never are reimbursed by Navy Federal.

19      88.    For example, on or about April and May, 2022, a fraudster transferred approximately

20  $3,500 from Plaintiff's personal bank account using the Zelle service.

21      89.    Plaintiff was seeking employment opportunities online.

22      90.    While browsing LinkedIn for potential roles, Plaintiff came across a job with a

23  company named, Appen purporting to be recruiting potential job candidates. Before submitting a job

24  application with Appen, Plaintiff reviewed its website and LinkedIn page.

25      91.    Plaintiff called Appen's number on its website and spoke with its representative.

26      92.    After conducting two interviews with Appen, she was purportedly extended an offer

27  of employment.

28      93.    The position was a remote chat customer support role. Accordingly, Plaintiff needed

                                              15
                          FIRST AMENDED CLASS ACTION COMPLAINT

1    necessary equipment before commencing her job, such as laptops and phones.

2        94.    Appen informed Plaintiff that she needed to pay her work equipment and applicable

3    shipping costs before starting her job, but assured her that Appen would reimburse her.

4        95.    Thus, over the span of a few weeks, Plaintiff made numerous Zelle transfers to Appen

5    under the impression that she would be receiving necessary equipment for her future job.

6        96.    Plaintiff received doctored invoices and tracking labels from Appen.

7        97.    In total, Plaintiff sent more than $3,500.00 to Appen.

8        98.    However, after a few weeks, Plaintiff grew weary as she never received any of the

9    equipment. When she began asking Appen about the status of her work equipment, Appen always had

10   an excuse.

11       99.    Eventually, Plaintiff called a number from Appen she found online and spoke with

12   representatives at the real Appen who informed her that  they had not hired anyone recently and were

13   not aware of Plaintiff's purported job offer.

14       100.   At this point, Plaintiff realized that she was never going to receive the equipment and

15   that she fell victim to fraud at the hands of the purported Appen.

16       101.   Plaintiff timely informed NFCU of the fraud who opened up a fraud claim on her

17   behalf and provisionally credited her account for the fraudulent Zelle transfers.

18       102.   For weeks, Plaintiff repeatedly requested updates and information regarding her claim

19   and NFCU's investigation, but Navy Federal failed to update Plaintiff.

20       103.   Indeed, after about four months, Plaintiff received a text message alert that her account

21   was over drafted. When she reviewed her account balance, she noticed that NFCU debited all the

22   Zelle transactions she disputed from her account, reversing the provisional credits she received.

23       104.   Navy Federal informed Plaintiff that it could not retried her funds and informed her

24   that it denied her claim.

25       105.   A few days later, after never receiving a shipping tracking number for the car engine,

26   Plaintiff tried calling the fraudster multiple times to no avail. At this point, Plaintiff suspected she fell

27   victim to fraud.

28       106.   Despite Plaintiff timely informing NFCU of the fraud, NFCU refused to help Plaintiff.

16

**FIRST AMENDED CLASS ACTION COMPLAINT**

1

<u>**CLASS ALLEGATIONS**</u>

2   107.   Plaintiff brings this action on behalf of herself and on behalf of all other persons

3   similarly situated, on behalf of the below-defined Classes:

4

5   All persons who: a) had a bank account with Navy Federal and were induced via fraud to perform a Zelle transfer; b) alerted Navy Federal of the fraudulent transfer within 60 days; and c) did not have the fraudulent transfer amount(s) credited by Navy Federal (the "Nationwide Class")

6

7

8   All persons in California who: a) had a bank account with Navy Federal and were induced via fraud to perform a Zelle transfer; b) alerted Navy Federal of the fraudulent transfer within 60 days; and c) did not have the fraudulent transfer amount(s) credited by Navy Federal (the "California Class")

9

10

11   108.   Excluded from the Classes are Navy Federal's officers, directors, and employees; any

12   entity in which Navy Federal has a controlling interest; and the affiliates, legal representatives,

13   attorneys, successors, heirs, and assigns of Navy Federal. Further excluded from the Classes are

14   members of the judiciary to whom this case is assigned, their families, and members of their staff.

15   109.   **Numerosity**: The members of the Classes are so numerous that joinder of all of them

16   is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based

17   on information and belief, the Class consists of thousands of individuals.

18   110.   **Commonality**: There are questions of law and fact common to the Classes, which

19   predominate over any questions affecting only individual Class Members. These common questions

20   of law and fact include, without limitation:

21   a.   Whether Plaintiff and the Class Members lost money that was transferred

22   from their account via Zelle;

23   b.   Whether Plaintiff and the Class Members were customers of NFCU at the

24   time they lost money;

25   c.   Whether Navy Federal violated EFTA by failing to adequately investigate the

26   disputes of Plaintiff and the Class Members;

27

28

d.    Whether Navy Federal violated EFTA by failing to correct errors on the accounts of Plaintiff and the Class Members within 45 days of the transaction being disputed;

e.    Whether Plaintiff and the Class Members are entitled to maximum statutory damages, costs, and fees under EFTA;

f.    Whether Navy Federal's conduct was "unlawful" as that term is defined in the UCL;

g.    Whether Navy Federal's conduct was "unfair" as that term is defined in the UCL;

h.    Whether Navy Federal have been conferred an enrichment by keeping funds that they were obligated to replace pursuant to Regulation E's error resolution obligations;

i.    Whether Navy Federal breached its contract; and

j.    Whether Plaintiff and the Classes are entitled to injunctive relief.

111.    **Typicality**: Plaintiff's claims are typical of those of other Class Members because Plaintiff was a victim of the Zelle scam by a third party who caused a withdrawal of funds from her NFCU account to occur through the NFCU/Zelle mobile application, after disputing that unauthorized transaction, Plaintiff was informed by Navy Federal that the unauthorized transaction would ultimately not be reversed.

112.    **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's Counsel are competent and experienced in litigating consumer class actions.

113.    **Predominance**: Navy Federal has engaged in a common course of conduct toward Plaintiff and Class Members, in that all were induced into allowing a third party to make unauthorized withdrawals on their NFCU accounts using Zelle. The common issues arising from Navy Federal's conduct affecting Class Members set out above predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

114.   **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Navy Federal. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

115.   Navy Federal has acted on grounds that apply generally to the Class, so that class certification is appropriate.

116.   All Members of the proposed Class are readily ascertainable. Navy Federal has access to consumer reporting of fraudulent and/or unauthorized transactions on their books and records. Using this information, Class Members can be identified and ascertained for the purpose of providing notice.

117.   **Notice**: Plaintiff anticipates providing direct notice to the Class for purposes of class certification, via U.S. Mail and/or email, based upon Navy Federal's and/or Navy Federal's agents' records.

### FIRST CAUSE OF ACTION

### CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"),

### CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*

### (On Behalf of Plaintiff and the Classes)

118.   Plaintiff Sanchez realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

119.   The UCL defines "unfair business competition" to include any "unlawful, unfair, or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

120.    The UCL imposes strict liability. Plaintiff need not prove that Navy Federal intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

### *"Deceptive" Prong*

121.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the public.

122.    Navy Federal's practices, as described herein, constitute "fraudulent" business practices in violation of the UCL because, among other things, Navy Federal's marketing regarding Zelle indicates the Bank will protect again fraudulent losses incurred using the Zelle service. Moreover, Navy Federal concealed the security risks of using the Zelle service, including the risk of fraud and the risk that fraudulent losses will never be reimbursed by NFCU as a matter of secret policy, is a practice that is likely to deceive a consumer acting reasonably under the circumstances, to the consumer's detriment.

### *"Unfair" Prong*

123.    A business practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practices against the gravity of the harm to the alleged victims.

124.    Navy Federal's actions constitute "unfair" business practices because, as alleged above, it declined to reverse fraudulent charges on the accounts of Plaintiff and Class Members, despite marketing representations, contract promises, and statutory obligations pursuant to EFTA.

125.    The harm to Plaintiff and Class Members grossly outweighs the utility of Navy Federal's practices as there is no utility to practices of Navy Federal.

### *"Unlawful" Prong*

126.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

FIRST AMENDED CLASS ACTION COMPLAINT

127.    Navy Federal's acts and practices alleged above constitute unlawful business acts or practices as they have violated the plain language of EFTA as described in Plaintiff's Seventh Cause of Action below.

128.    The violation of any law constitutes as "unlawful" business practice under the UCL.

129.    These acts and practices alleged were intended to or did result in violations of EFTA.

130.    Navy Federal has and will continue to unlawfully deny the transaction disputes of Plaintiff, the Classes, and the public by claiming that said disputed transactions are "authorized," even though said transactions are actually "unauthorized," as that term is defined by EFTA and applicable regulations. Consequently, the practices of NFCU constitute unfair and unlawful business practices within the meaning of the UCL.

131.    Pursuant to the UCL, Plaintiff and the Classes are entitled to preliminary and permanent injunctive relief and order Navy Federal to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff and the Classes of all the revenues associated with this unfair and unlawful competition, or such proton of said revenues as the Court may find applicable.

132.    Pursuant to the UCL, Plaintiff and the Classes are entitled to preliminary and permanent injunctive relief and an order requiring Navy Federal to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff and the Classes of all revenues associated with this unfair and unlawful competition, or such portion of said revenues as the Court may find applicable.

## SECOND CAUSE OF ACTION

### Violation of California's False Advertising Law ("FAL")

### Cal. Bus. & Prof. Code §§ 17500, *et seq.*

### (Asserted on Behalf of Plaintiff and the Classes)

133.    Plaintiff repeats and realleges the above allegations as if fully set forth herein.

134.    California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, states that "[i]t is unlawful for any ... corporation ... with intent … to dispose of ... personal property ... to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... from this state before the public in any state, in any newspaper or other

publication, or any advertising device, or by public outcry or <sub>proclamation</sub>, or in any other manner or means whatever, including over the Internet, any statement...which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading...."

135.    Navy Federal's material misrepresentations and omissions alleged herein violate Bus. & Prof. Code § 17500.

136.    Navy Federal knew or should have known that its misrepresentations and omissions were false, deceptive, and misleading.

137.    Pursuant to Business & Professions Code §§ 17203 and 17500, Plaintiff and Class Members, on behalf of the general public, seeks an order of this Court enjoining Navy Federal from continuing to engage, use, or employ their practice of misrepresenting the Zelle service.

138.    Further, Plaintiff and Class Members seek an order requiring Navy Federal to disclose such misrepresentations, and additionally request an order awarding Plaintiff restitution of the money wrongfully acquired by Navy Federal by means of said misrepresentations.

139.    Additionally, Plaintiff and the Classes seek an order requiring Navy Federal to pay attorneys' fees pursuant to Cal. Civ. Code § 1021.5.

### THIRD CAUSE OF ACTION

**Breach of Contract Including Breach of the Covenant of Good Faith and Fair Dealing**

**(Asserted on Behalf of the Plaintiff and the Classes)**

140.    Plaintiff repeats and realleges the above allegations as if fully set forth herein.

141.    Plaintiff and members of the Class contracted with NFCU for checking account services, as embodied in the Deposit Agreement & Disclosures.

142.    NFCU breached the terms of its contract with consumers when as described herein, NFCU failed to refund fraudulent transactions on the Zelle money transfer service and failed to reimburse accountholders for fraud-induced losses incurred using the Zelle service.

143.    Further, under the law of each of the states where NFCU does business, an implied covenant of good faith and fair dealing governs every contract. The covenant of good faith and fair dealing constrains Navy Federal's discretion to abuse self-granted contractual powers.

144.    This good faith requirement extends to the manner in which a party employs discretion conferred by a contract.

145.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

146.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Other examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

147.    Navy Federal breached the covenant of good faith and fair dealing when it failed to fairly investigate reported fraudulent transactions on the Zelle money transfer service, failed to reimburse accountholders for fraudulent losses incurred using the Zelle service, and adopted and unfair and unreasonable definition of the term "unauthorized transaction."

148.    Each of Navy Federal's actions were done in bad faith and was arbitrary and capricious.

149.    Plaintiff and members of the Classes have performed all of the obligations imposed on them under the contract.

150.    Plaintiff and members of the Classes have sustained monetary damages as a result of NFCU's breaches of the contract and covenant of good faith and fair dealing.

## FOURTH CAUSE OF ACTION

### NEGLIGENCE

### (On Behalf of Plaintiff and the Classes)

151.    Plaintiff realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

152.    NFCU owed Plaintiff and the Classes at least a duty to take reasonable steps to safeguard their financial information and protect their financial accounts from malicious third parties, to adequately warn of known risks and/or dangers associated with the Zelle mobile application, and to properly investigate disputed transaction initiated and consummated through the NFCU and/or Zelle app.

153.    Zelle owed Plaintiff and the Classes at least a duty to take reasonable steps to adequately warn of known risks and/or dangers associated with the NFCU/Zelle app, and to take appropriate steps in response to a known scam involving the app to protect consumers from malicious third parties.

154.    Navy Federal breached its obligations to Plaintiff and Class Members and was otherwise negligent and/or reckless by at least:

        a.    Failing to maintain adequate data security measures to prevent or reduce the risk of disclosure of the names, phone numbers, and bank affiliation of Plaintiff and the Class to malicious third parties;

        b.    Failing to adequately protect the private information of Plaintiff and the Class;

        c.    Failing to properly warn Plaintiff and the Class of the risks and/or dangers associated with the NFCU/Zelle mobile app or informing consumers about the Zelle-related scams;

        d.    Failing to adequately investigate and document findings from the investigations of fraud-related EFT disputes of the unauthorized transactions made on the accounts of Plaintiff and the Class using the NFCU/Zelle payment platform.

        e.    Failing to take appropriate steps to avoid unauthorized transactions through the NFCU/Zelle mobile application in response to known scams and continuing with business as normal;

        f.    Failing to implement appropriate and sufficient safeguards against scams of the nature alleged in the Complaint in light of the knowledge that those scams have been rampant across the country;

g.    Failing to review account agreements and disclosures to ensure they do not attempt to diminish or limit consumers' rights under Regulation E;

h.    Permitting scammers to use Zelle's member banks to siphon funds from Plaintiff's and Class Members' accounts using the NFCU/Zelle payment platform;

i.    Failing to reverse unauthorized transactions pursuant to Regulation E error resolution requirements following disputes of Plaintiff and the Class despite Navy Federal's knowledge that said transactions were unauthorized as part of a scam that is well-known to Navy Federal; and

j.    Failing to permanently reverse unauthorized transactions upon a sufficient showing by Plaintiff and the Class that said transactions were unauthorized.

155.    As a direct and proximate result of Navy Federal's breach, Plaintiff and Class Members lost funds from their NFCU bank accounts.

156.    Plaintiff and Class Members are entitled to damages for their continuing and increased risk of fraud and their loss of money.

**FIFTH CAUSE OF ACTION**

**UNJUST ENRICHMENT**

**(On Behalf of Plaintiff and the Classes)**

157.    Plaintiff realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

158.    NFCU has been conferred the benefit or enrichment by keeping funds that they are otherwise obligated to replace for Plaintiff and Class Members pursuant to Regulation E's error resolution obligations.

159.    NFCU knew and appreciated this benefit or enrichment and the detriment or impoverishment to Plaintiff and Class Members.

160.    It is inequitable for NFCU to retain the benefit or enrichment of keeping these funds when they know that, as financial institutions, they are obligated to comply with Regulation E and credit Plaintiff and putative Class Members' accounts for the amounts taken.

FIRST AMENDED CLASS ACTION COMPLAINT

161.     Plaintiff and Class Members have sustained a detriment or an impoverishment from NFCU's failure to remedy this inequity and are entitled to restitution for the unjust enrichment to NFCU.

162.     Plaintiff and Class Members are entitled to restitution and disgorgement of the funds unjustly retained by NFCU in the absence of any legal relief.

**SIXTH CAUSE OF ACTION**

**VIOLATION OF THE ELECTRONIC FUND TRANSFER ACT ("EFTA"),**

**15 U.S.C. §§ 1693, *ET SEQ.***

**(On Behalf of Plaintiff and the Classes)**

163.     Plaintiff realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

164.     The Electronic Fund Transfer Act ("EFTA") and Regulation E apply to electronic fund transfers that authorize a financial institution to debit or credit a consumer's account. 12 C.F.R. 1005.3(a).

165.     The primary objective of EFTA is "the protection of individual consumers engaging in electronic fund transfers and remittance transfers." 12 C.F.R. § 1005.1(b).

166.     Financial institutions have error resolution obligations pursuant to Regulation E in the event that a consumer notifies the financial institution of an error. 12 C.F.R. § 1005.11.

167.     NFCU is a financial institution. 12 C.F.R. § 1005.2(i).

168.     "If a financial institution, within sixty days after having transmitted to a consumer pursuant to [15 U.S.C. § 1693d(a), (c), or (d)] or notification pursuant to [15 U.S.C. § 1693(d)] receives oral or written notice in which the consumer[:] (1) sets forth or otherwise enables the financial institution to identify the name and the account number of the consumer; (2) indicates the consumer's belief that the documentation, or, in the case of notification pursuant to [15 U.S.C. § 1693d(b)], the consumer's account, contains an error and the amount of such error; and (3) sets forth the reasons for the consumer's belief (where applicable) that an error has occurred," the financial institution is required to investigate the alleged error. 15 U.S.C. § 1693f(a).

169.    After said investigation, the financial institution must determine whether an error has occurred and report or mail the results of such investigation and determination to the consumer within ten (10) business days. *Id.*

170.    A financial institution that provisionally recredits the consumer's account for the amount alleged to be in error pending an investigation, however, is afforded forty-five (45) days after receipt of notice of error to investigate. *Id.* § 1693f(c).

171.    Pursuant to the EFTA, an error includes "an unauthorized electronic fund transfer." *Id.* § 1693f(f).

172.    An Electronic Fund Transfer ("EFT") is any transfer of funds that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account. 12 C.F.R. 1005.3(b)(1). Accordingly, Regulation E applies to any P2P or mobile payment transactions that meet the definition of EFT. 12 C.R.F. 1005.3(b)(1)(v); *id.*, Comment 3(b)(1)-1ii.

173.    Unauthorized EFTs are EFTs from a consumer's account initiated by a person other than the consumer without actual authority to initiate the transfer and from which the consumer receives no benefit. 12 C.F.R. 1005.2(m).

174.    According to the CFPB and FDIC, when a third party fraudulently induces a consumer into sharing account access information that is used to initiate an EFT from the consumer's account, that transfer meets Regulation E's definition of an unauthorized EFT.[10]

175.    In particular, Comment 1005.2(m)-3 of Regulation E explains that an unauthorized EFT includes a transfer initiated by a person who obtained the access device from the consumer through robbery or fraud. As such, when a consumer is fraudulently induced into sharing account access information with a third party, and a third party uses that information to make an EFT from the consumer's account, the transfer is an unauthorized EFT under Regulation E.[11]

---

[10] *See supra*, note 5.

[11] *Id.*

176.     Here, third-party fraudsters made unauthorized money transfers from the Navy Federal accounts of Plaintiff and Members of the Classes.

177.     After the unauthorized EFTs were made, the EFTs appeared on the bank statements of Plaintiff and Class Members.

178.     Plaintiff and Class Members notified NFCU of these errors within sixty (60) days of their appearances on the accounts of Plaintiff and other Class Members.

179.     After receiving notice of the unauthorized EFTs on Plaintiff's and other Class Members' accounts, NFCU erroneously concluded that that the unauthorized EFTs were authorized.

180.     As a direct and proximate result of the conduct of NFCU, Plaintiff and other Class Members were unable to reclaim funds that were fraudulently taken from their accounts with NFCU within the authorized period for error resolution.

181.     Upon information and belief, NFCU knowingly and willfully concluded that the transfers of funds via Zelle on accounts of Plaintiff and other Class members were not in error when such conclusions could not reasonably have been drawn from the evidence available to the financial institutions at the time of the investigation. 15 U.S.C. § 1693f(e)(2).

182.     Upon information and belief, NFCU intentionally determined that the unwanted transfer of funds via Zelle on accounts of Plaintiff and Class Members were not in error due to, at least in part, NFCU's financial self-interest as a member-bank of Zelle, and to avoid its liability to Plaintiff and other Class members for the unauthorized transfers pursuant to Regulation E.

183.     Navy Federal refused to reverse or refund funds to Plaintiff and Class members.

184.     As such, Plaintiff and Class Members are each entitled to (i) actual damages; (ii) treble damages; (iii) the lesser of $500,000.00 or one percent (1%) of the net worth of NFCU; and (iii) reasonable attorneys' fees and costs. *Id.* §§ 1693f(e)(2), 1693m(a)(2)(B)-(3).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment against Navy Federal as follows:

A.     Class certification of this action;

B.     Appointment of Plaintiff as Class Representative;

C.     Appointment of Plaintiff's attorneys as Class Counsel;

1     D.     An award of actual damages, in an amount to be determined at trial;

2     E.     An award of treble damages pursuant to the EFTA;

3     F.     An award of the lesser of $500,000.00 or one percent (1%) of the net worth of Navy

4 Federal;

5     G.     Injunctive and other equitable relief against Navy Federal as necessary to protect the

6 interests of Plaintiff and other Class Members, and an order prohibiting Navy Federal from engaging

7 in unlawful and/or unfair acts described above, including public injunctive relief;

8     H.     Disgorgement;

9     I.     An order of restitution from NFCU for unjust enrichment;

10     J.     An order declaring Navy Federal's conduct as unlawful;

11     K.     Costs of Suit;

12     L.     Pre- and post-judgment interest;

13     M.     An award of reasonable attorneys' fees; and

14     N.     Any other relief the Court may deem just and proper, including interest.

15             **DEMAND FOR TRIAL BY JURY**

16     Plaintiff, individually and on behalf of all others similarly situated, hereby demand a jury trial

17 on all claims so triable.

18 Dated: November 18, 2022         **KALIELGOLD PLLC**

19

20                 By:*/s/ Jeffrey D. Kaliel*

21                  Jeffrey D. Kaliel

                      Sophia G. Gold

22

23                 **EDELSBERG LAW, P.A.**

24                 Scott Edelsberg

25                 *Attorneys for Plaintiff and the*

26                 *Proposed Class*

27

28

FIRST AMENDED CLASS ACTION COMPLAINT

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of November, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system and a copy has been served on all parties who are registered with the CM/ECF service.

*/s/ Jeffrey D. Kaliel*
Jeffrey D. Kaliel

FIRST AMENDED CLASS ACTION COMPLAINT